UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                    :

EDNER VERNA,                      :

                              :    11 Civ. 7947 (AJN) (GWG)
                 Plaintiff,      :

                              :
             -v.-             :    REPORT AND RECOMMENDATION
                              :
                              :

COMMISSIONER OF SOCIAL SECURITY,  :

                              :
             Defendants.     :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Edner Verna brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

his claim for disability insurance benefits.  The parties have cross-moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1]  For the reasons stated

below, Verna's motion should be denied and the Commissioner's motion should be granted.


I.      BACKGROUND

     A.     Verna's Claim for Benefits and Procedural History

      On May 7, 2002, Verna filed an application for disability insurance.  R. 107–09.  Verna

claimed that he "became unable to work because of [his] disabling condition on February 2,

2002," and that he is "still disabled."  R. 107.  The Commissioner denied Verna's application on

---

[1]  See Notice of Motion, filed Aug. 24, 2012 (Docket # 10); Defendant's Memorandum of Law in Support of His Motion for Judgment on the Pleadings, filed Aug. 24, 2012 (Docket # 11); Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Sept. 24, 2012 (Docket # 13) ("Verna Mem."); Notice of Cross Motion, filed Sept. 25, 2012 (Docket # 14); Reply Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Oct. 12, 2012 (Docket # 16).

September 12, 2002, R. 54–57, and Verna subsequently requested a hearing before an administrative law judge ("ALJ"), R. 58.  On May 18, 2004, Verna, represented by an attorney, withdrew his request for a hearing in order to develop evidence supporting his disability claim. R. 40–44.

Ultimately, a hearing was held on October 17, 2006, R. 25–39, and the ALJ issued an opinion on December 18, 2006 finding that Verna was not disabled, R. 14–24.  The Appeals Council reversed the ALJ's decision and found that Verna was disabled from February 2, 2002 to December 31, 2004.  R. 11.  Verna had subsequently filed a disability claim with a state agency, which had found Verna disabled beginning on February 21, 2007.  Id.  The Appeals Council left the state agency's determination undisturbed.  Id.  Thus, the Appeals Council's decision effectively held that Verna was not disabled for the period from January 1, 2005 to February 20, 2007.

Verna filed an action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the Commissioner's decision.  See Complaint, Verna v. Comm'r of Soc. Sec., 08 Civ. 2498 (GEL) (DFE) (S.D.N.Y. Mar. 12, 2008) (Docket # 1).  The parties agreed to remand the case to the Commissioner for further administrative proceedings.  See Stipulation and Order of Remand, Verna v. Comm'r of Soc. Sec., 08 Civ. 2498 (GEL) (DFE) (S.D.N.Y. Sept. 8, 2008) (Docket # 5).  On November 21, 2008, the Appeals Council ordered further proceedings in front of an ALJ to develop the record with regard to the period from January 1, 2005 to February 20, 2007.  R. 690–91.

On June 21, 2010, ALJ Brian W. Lemoine held a hearing to determine whether Verna was disabled from January 1, 2005 to February 20, 2007.  R. 994–1030.  The ALJ issued a decision finding that Verna was not disabled during that time period.  R. 664–73.  Verna

thereafter brought the instant action challenging the denial of benefits.  See Complaint, filed
Nov. 7, 2011 (Docket # 1).

      B.      Evidence Presented Before the ALJ

      Because the only issue in this case is whether Verna was disabled between January 1,
2005 and February 20, 2007, we summarize the administrative record only insofar as it may be
viewed as relating to this period.

      1.      Records Relating to Verna's Medical Condition

      On June 11, 2004, Dr. Faidherbe Ceus examined Verna and diagnosed him with Crohn's
disease.[2]  R. 259–60.  Verna weighed 150 pounds at the time of the examination.  R. 259.  Dr.
Ceus described Verna as "a thin man who looks chronically sick."  Id.  His impression was that
Verna's condition was deteriorating.  R. 260.  Verna was in "continuous abdominal discomfort,"
anemic, and "unable to perform any type of work."  Id.

      Nyack Hospital ("Nyack") admitted Verna on June 13, 2004 due to his complaints of
abdominal pain and weight loss.  R. 263.  On examination, he weighed 150 pounds.  R. 348.  Dr.
Roy Eriksen, M.D., noted that Verna was "severely anemic" and his impression was that Verna
had Crohn's disease, anemia secondary to gastrointestinal bleeding, and hyperglobulinemia.[3]  R.
317.  Laboratory testing revealed that Verna was positive for human immunodeficiency virus
("HIV").  R. 282, 297, 329, 333.  Upon Verna's discharge on June 24, 2004, Dr. Eriksen

---

[2]  Crohn's disease is defined as a synonym of "regional enteritis," which is in turn defined as "a
subacute chronic [enteritis], of unknown cause, involving the terminal ileum and less frequently
other parts of the gastrointestinal track."  See Stedman's Medical Dictionary 512, 597 (27th ed.
2000) ("Stedman's").

[3]  Hyperglobulinemia is "[a]n abnormally high concentration of globulines in the circulating
blood plasma."  Stedman's at 849.

3

diagnosed Verna with acquired immune deficiency syndrome ("AIDS"), R. 269, and referred

him to the HIV clinic at Westchester County Medical Center ("WCMC") for continuing

treatment, R. 269–70.

Following Verna's discharge, he went to the WCMC regularly for follow-up treatment.

See R. 493–582.  During an examination on July 9, 2004, Verna complained of difficulty

chewing and swallowing, occasional constipation, stomach pain, and weight loss.  R. 582.  He

weighed 137 pounds while his ideal weight was 208 pounds.  R. 535, 582.  In August 2004, his

weight fell to 130 pounds.  R. 564, 570.  Verna began a highly active anti-retroviral therapy

regimen.  R. 570, 572.  On September 3, 2004, Verna's weight was only 129 pounds, but he

indicated that he felt better.  R. 563.  By September 24, 2004, Verna's weight increased to 154

pounds and he was in "good spirits."  R. 561.  During an examination on October 18, 2004,

Verna was "feeling well" and his weight was 177 pounds.  R. 562.  On December 3, 2004, Verna

weighed 172 pounds.  R. 558.  A nurse noted Verna's complaints of increased gas, but remarked

that he had no diarrhea and was in "good spirits."  Id.  On December 30, 2004, Verna

complained of abdominal pain and cramping during an examination at the WCMC

gastrointestinal clinic.  R. 557.  He was prescribed medication and was directed to return in six

weeks.  Id.  At an examination on January 7, 2005, Verna weighed 168 pounds.  R. 556.  A nurse

noted that he had elevated blood glucose levels and ordered that he undergo further testing.  Id.

Verna was hospitalized for three days at Nyack starting January 26, 2005 based on his

complaints of abdominal pain for the three previous days.  R. 413–91.  Dr. Dean Miller noted

that Verna's Crohn's disease dated back to 2002, and that Verna had undergone an ileal

4

resection[4] in 2002.  R. 413.  A CT scan of Verna's abdomen revealed a small bowel obstruction

and gallstones.  R. 450.  Dr. Miller's diagnostic impression was that Verna had an "exacerbation

of Crohn's disease" and "co-morbid conditions including HIV[,] AIDS[,] and diabetes . . . ."  R.

413.  Dr. Miller remarked that Verna had "[n]otable" improvement during his hospital stay as

"[h]is abdominal pain [was] resolved" and "he was able to tolerate [an] advancing diet."  Id.

On February 23, 2005, a nurse prescribed the drug Glucotrol to treat Verna's diabetes and

taught him how to use a blood glucose monitoring device.  R. 554.  He weighed 170 pounds at

the time of examination.  Id.  Verna saw a nutritionist on March 8, 2005, who stated that he had a

good appetite, that he ate three meals per day, and that he denied having any gastrointestinal

problems.  R. 553.  The nutritionist educated Verna on an appropriate diet to address his Crohn's

disease.  Id.  A nurse examining Verna on the same day noted that he had eczema on his right

foot, but found that his gastrointestinal examination was negative.  R. 552.  On March 29, 2005,

Verna complained about bilateral leg swelling caused by the steroid Entocort increasing his

blood sugar.  R. 550.  The nutritionist again instructed Verna about the proper diet for his

condition.  R. 551.

On April 8, 2005, a nurse observed that Verna had edema[5] in his legs.  R. 538.  Dr.

Descu, an endocrinologist at the WCMC, examined Verna on May 4, 2005.  R. 542–44.  Dr.

Descu noted Verna's medical history of HIV, Hepatitis C, and Crohn's disease, R. 542, and

concluded that Verna had insulin dependent diabetes mellitus, R. 544.  On May 25, 2005, Verna

---

[4]  An ileal resection is "[a] procedure performed for the specific purpose of removal" of the
ileum, Stedman's at 873, 1550, which is "[t]he third and longest portion of the small intestine,"
id. at 874.

[5]  Edema is "[a]n accumulation of an excessive amount of watery fluid in the cells or
intercellular tissues."  Stedman's at 566–67.

5

returned to the WCMC endocrinology clinic and was examined by Dr. Reshma Farab.  R.

540–41.  Verna weighed 178 pounds, R. 540, and his blood sugar levels were elevated despite

ceasing to take steroid medications, R. 541.  Dr. Farab diagnosed diabetes mellitus and

prescribed glipizide and Metformin.  Id.

　　　　During an examination by a nurse on May 27, 2005, there was no evidence of swelling in

Verna's legs and he was "doing well."  R. 539.  At an examination at the WCMC endocrinology

clinic on June 29, 2005, Verna reported that his blood sugar readings typically ranged from 95 to

120, but sometimes as high as 170.  R. 536.  It was reported that Verna's diabetes was

"apparently well controlled" on medication.  R. 537.

　　　　During a nutrition assessment on July 15, 2005, Verna reported "no problems."  R. 535.

The nutritionist noted that Verna's food intake was "adequate" and that his weight at 178 pounds

was "stable."  Id.  When Verna saw the nutritionist again on August 12, 2005, he complained of

"having a flare up of Crohn's disease."  R. 533.  The nutritionist suggested changes to Verna's

diet, including reducing his fiber and fat intake, as well as having small and frequent meals.  Id.

On the same day, a nurse examined Verna and observed that his abdomen was "soft [and] tender

to pressure."  R. 531.  Verna weighed 178 pounds and the nurse noted that he was in "good

spirits."  Id.

　　　　On August 17, 2005, Verna returned to the WCMC gastrointestinal clinic complaining of

"moderate intermittent [abdominal] pain that [he] had for years."  R. 529.  Verna denied any

recent nausea, vomiting, diarrhea or constipation.  Id.  On examination, it was noted that Verna

had a "tense abdomen."  Id.  Verna had epigastric tenderness in the left upper quadrant

characterized by guarding, but one minute later these symptoms disappeared.  Id.  Verna

underwent a CT scan of his abdomen and pelvis.  R. 597–98, 923–24.  The scan revealed "bowel

6

wall thickening involving the terminal ileum, most prominent just proximal to the ileocecal valve." R. 597, 598, 923, 924.  The ileum was dilated, but there was no evidence of obstruction. R. 597, 598, 923, 924.  Dr. Michael Singer, the attending radiologist, concluded that the findings were consistent with Verna's history of Crohn's disease.  R. 597, 598, 923, 924.

On September 23, 2005, Verna complained of occasional pain and tenderness in the abdomen. R. 527.  A nurse observed that Verna had mild diffuse abdominal tenderness.  Id.  At an examination at the WCMC endocrinology clinic on September 28, 2005, Verna complained of numbness in his right foot for which he was referred to a podiatrist. R. 525–26.  Additionally, Verna complained of occasionally feeling a sensation of falling, R. 525, for which he was instructed to check his blood sugar when this sensation occurred, R. 526.  The following day, Verna returned to the WCMC gastrointestinal clinic with complaints of abdominal pain.  R. 524.  It was noted that Verna's abdomen was soft with mild tenderness and no guarding, and that he was under "no distress."  Id.  Verna's symptoms were assessed as relating to his Crohn's disease, and he was directed to continue taking the medication Asacol.  Id.

On October 27, 2005, Verna denied having diarrhea, fevers, chills, or any new complaints of intermittent abdominal pain.  R. 512.  He weighed 181 pounds, and his abdomen was soft with mild epigastric tenderness.  Id.  Then, on November 18, 2005, a dietician counseled Verna on his diet.  R. 510.  Verna weighed 180 pounds, and reported a fair appetite consisting of two meals per day.  Id.  The dietician encouraged Verna to decrease the fat and fiber in his diet, and to eat small, frequent meals.  Id.

At an examination on November 28, 2005, Verna tested positive for Hepatitis C.  R. 511.  Verna's gait was normal and a gastrointestinal examination was negative.  Id.  At a follow-up examination at the WCMC on December 8, 2005, Verna complained of having experienced

pelvic pain for the past four to five years.  R. 508–09, 904.  Verna assessed that his pain was a six or seven on a scale from zero to 10.  R. 509.

On January 19, 2006, Verna reported a "noted improvement" since his previous examination.  R. 506.  Verna claimed to feel better and did not complain of abdominal pain.  Id. Then on February 1, 2006, Dr. Descu of the WCMC endocrinology clinic examined Verna.  R. 504–05.  Verna weighed 180 pounds and his blood sugar ranged from 100 to 120.  R. 504.  He reported no pain.  Id.  His extremities exhibited no edema.  Id.  Dr. Descu directed Verna to continue his medications.  R. 505.

At a follow-up examination at the WCMC endocrinology clinic on March 1, 2006, Verna weighed 178 pounds and reported feeling well.  R. 502.  He reported that his blood sugar levels ranged from 80 to 137.  Id.  He was directed to stay on the same medications for his diabetes and to return to the clinic in three months.  R. 503.  On March 10, 2006, Verna was again examined at the WCMC.  R. 501.  He weighed 178 pounds, and reported feeling well.  Id.  A gastrointestinal examination showed no tenderness in his abdomen.  Id.  Verna was directed to return to the clinic in 10 to 12 weeks.  Id.

On April 17, 2006, a CT of Verna's abdomen and pelvis revealed an "[e]xtensive area of bowel wall thickening involving the terminal ileum and distal small bowel with dilation of the distal ileum."  R. 921.  The findings were consistent with a previous CT scan performed on August 17, 2005, "but the distal small bowel appear[ed] more inflamed . . . ."  Id.  There was no evidence of a discrete abscess.  Id.  Following the CT scan, Verna was examined at the WCMC gastrointestinal clinic on April 20, 2006.  R. 499.  Verna weighed 183 pounds and complained of abdominal pain and tenderness.  Id.  The examining physician concluded that Verna had a "flare" of Crohn's disease.  Id.

Dr. Edward Lebovics of the WCMC gastrointestinal clinic examined Verna on May 11, 2006.  R. 496.  Dr. Lebovics noted that Verna "fe[lt] good."  Id.  Verna reported no abdominal pain, diarrhea, fevers, chills, or weight loss.  Id.  His abdomen was soft and non-tender.  Id.  Dr. Lebovics concluded that Verna's Crohn's disease was asymptomatic on the medication Entocort. Id.  He recommended that Verna maintain his existing medication regimen, and return to the clinic in two to three months.  Id.

On October 5, 2006, Verna went to the WCMC gastrointestinal clinic complaining of right "side pain" that was "always there" and for which he could get no relief.  R. 900.  He characterized the pain as "aching" and rated it as a six or seven on a scale of zero to 10.  R. 901. He had ceased taking his medication as he had run out one month earlier.  R. 900.  On examination, his abdomen was soft and tender in the lower right quadrant.  Id.  Dr. Lebovics prescribed Asacol and directed him to return to the clinic in three to four months.  Id.

Dr. Joseph P. Ha of the WCMC general surgery clinic examined Verna on October 31, 2006.  R. 898.  At the time, Verna weighed 178 pounds.  Id.  He complained of lower right abdominal discomfort with loose stools that had bothered him for years.  Id.  He estimated the pain as a six or seven out of 10, and described it as "unbearable."  R. 899.  Dr. Ha observed that Verna's abdomen was soft and tender.  R. 898.  He noted that Verna had previously had relief through taking the medication Entocort, and concluded that no surgical intervention was required at that time.  Id.  On November 17, 2006, a nurse noted that Verna's weight remained the same, that he was taking Asacol and Darvon for pain, and that he was in need of a "GI" appointment. R. 897.

The WCMC endocrinology clinic saw Verna on December 6, 2006 for a follow-up examination for his diabetes.  R. 895–96.  He weighed 175 pounds.  R. 895.  He complained of a

"heavy sensation" in his toes and an examination exposed a mild decrease in sensation on the

plantar aspect of his toes.  Id.  His blood sugars were on average between 70 and 100, but he had

one reading as high as 174.  R. 896.  He was referred for podiatry and ophthalmology

appointments.  Id.  On December 14, 2006, Verna returned to the WCMC gastrointestinal clinic

complaining of "constant" right abdominal pain.  R. 893.  He described the pain as "sharp" and

rated it as a six on a scale of 10.  R. 894.  He stated that his appetite had varied, and that he had

no constipation, diarrhea, or recent changes in bowel habits.  R. 893.  His abdomen was soft and

palpitations to the right lower quadrant were painful.  Id.  He was instructed to continue taking

his medications, to undergo further testing, and to return to the clinic in three months' time.  Id.

2.    Dr. Michael M. Phillips's Expert Opinion

At the request of the Commissioner, Dr. Michael M. Phillips — a board-certified

gastroenterologist — reviewed Verna's medical records from February 2002 to December 2006,

which culminated in a written report prepared on June 30, 2007.  R. 648–50.  Dr. Phillips noted

that for the two years following a March 2002 surgery, Verna had "a fairly stormy course" that

involved "multiple hospitalizations for what turned out to be an unusual presentation of Crohn's

disease[,] recurring abdominal pain[,] and severe diarrhea."  R. 649.  Dr. Phillips remarked that

Verna lost significant weight during this time period, was diagnosed with HIV/AIDS, and as of

June 11, 2004, "his examining physicians felt that he was too ill to perform any type of work."

Id.

Dr. Phillips assessed that starting in 2005, however, Verna gained significant weight,

there was "significant improvement of his gastrointestinal and other symptoms," and "with

treatment of his HIV, he appeared to do much better."  Id.  In Dr. Phillips's opinion, from

February 2002 to December 31, 2004, Verna's severe Crohn's disease met or equaled the listed

10

impairment found in 20 C.F.R. Part 404, Subpt. P, App. 1 § 5.07.  Id.  Dr. Phillips opined that

Verna "lacked the residual functional capacity to perform significant gainful activity."  R.

649–50.  But for the period after December 2004, Dr. Phillips believed "that [Verna] had

regained residual functional capacity to perform light to moderate work on a sustained basis."  R.

650.

### 3.   Dr. Adam Spiegel's Expert Opinion

On August 16, 2007, Dr. Adam Spiegel, M.D., a gastroenterologist, filled out a Medical

Source Statement form concerning Verna's ability to work.  R. 660–63.  Neither the form nor Dr.

Spiegel's notes indicate that he was evaluating Verna's ability to work for any time period other

than the date on which it was completed.  Dr. Spiegel stated on the form that Verna's

impairments prevented him from lifting more than 10 pounds, R. 660; standing or walking more

than two hours over an eight-hour time period, id.; and sitting more than six hours over an eight-

hour time period, R. 661.  Dr. Spiegel noted that Verna had "chronic right leg

pain[,] . . . . chronic Crohn's disease, active inflammation of his small and large intestine, with

chronic abdominal pain, chronic need for immunosuppressive medications which have many

side effects (fatigue, weakness, swelling)," as well as "chronic diarrhea."  R. 661.  Dr. Spiegel

found that Verna occasionally had postural and manipulative limitations, as he noted that

Verna's "abdominal pain worsened by active physical activity."  R. 661–62.

In its November 21, 2008 decision, the Appeals Council directed the ALJ on remand to

recontact Dr. Spiegel in order to clarify his medical opinion of Verna's condition from January

2005 to February 2007.  R. 690.  On August 1, 2009, ALJ Lemoine sent a letter to Dr. Spiegel

requesting that he provide copies of any of Verna's medical records beginning in 2002 that were

in his possession.  R. 757, 941.  The letter also requested that Dr. Spiegel provide a "clarification

of [his] opinion on the attached Medical Source Statement form." R. 757, 941.  On August 7,

2009, Dr. Spiegel responded by filling out a second Medical Source Statement form; but this

form, which was signed in August 2009, does not reflect that it related to any past period.  See R.

942–47.[6]  Nor did Dr. Spiegel supply any medical records.  R. 672.  The administrative record

thus contains no medical records from Dr. Spiegel other than the forms he filled out for Verna's

disability claim.

        4.       October 17, 2006 Hearing

       At a hearing before an ALJ on October 17, 2006, Verna stated that he attended two years

of college, but did not graduate.  R. 27.  Verna testified that he previously worked as a meat

delivery driver for Highland and Robinson, which required him to load and unload deliveries

between 40 to 70 pounds.  R. 32–33.  Verna stated that he had been unable to work since

February 2002 due to "constant pain or weak[ness]."  R. 28.  He described the pain as

"squeezing."  R. 29.  He claimed to have digestive problems "all the time," id., including

"[c]onstant" diarrhea requiring him to use the bathroom up to 10 times per day, R. 38.  He also

stated that he had difficulty balancing when he walked, which often necessitated the use of a

cane.  R. 37.  Finally, Verna stated that his medications caused dizziness and memory loss.  R.

33–34.  Due to his condition, Verna seldom left his home, R. 37, and he spent a substantial

amount of time watching television, R. 34.  He lived alone, R. 29, but he indicated that his

---

[6]  On this form, Dr. Spiegel found that Verna could neither lift nor carry more than 10 pounds.
R. 942.  He found that Verna could only sit for one hour, stand for 20 minutes, and walk for 10
minutes.  R. 943.  Over an eight-hour day, Dr. Spiegel believed that Verna could only sit five
hours, stand two hours, and walk one hour.  Id.  Noting avascular necrosis of the hips, R.
942–44, 946, Dr. Spiegel found limitations in Verna's feet, as he could walk no more than 40 or
50 feet without the assistance of a cane, R. 943–44.  In Dr. Spiegel's opinion, Verna's condition
had lasted or would last more than a year.  R. 947.

brother assisted in household activities such as taking out the trash, R. 36.  He testified that he could drive short distances, but he had a car service drive him to his doctors' appointments and to the hearing that day.  R. 31–32.

          5.     June 21, 2010 Hearing

Verna testified before ALJ Lemoine on June 21, 2010.  R. 994–1030.  From 1979 to 1989, Verna stated that he worked in a kitchen as a dish washer, steward, and kitchen manager. R. 1004–05.  Starting in 1989, Verna began working as a meat delivery driver.  R. 1005.  In that position, he was required to drive approximately 75 miles per day, and to lift boxes weighing between 40 and 80 pounds.  R. 1003.

Verna testified that he last worked in February 2002.  R. 1007.  He stated that he was unable to work since then because he has "been on medication," has been "weak," and "can't function properly."  R. 1008.  He complained of "constant" stomach pain since a surgery in 2002, R. 1015, and stated that his medications often made him "useless" and "knock[ed] [him] out," R. 1013.

Noting Verna's weight gain after December 2004 — a circumstance relied upon by Dr. Phillips, see R. 649 — the ALJ asked Verna if he felt better in 2005 and 2006.  R. 1008–09. Verna responded that his life was "misery;" that he "couldn't recall you know a time, you know, I [sic] feel better or whatever;" and that he was suffering "on a daily basis."  R. 1009.  The ALJ pressed Verna on whether there was any difference between the way he felt in 2003–2004 compared with 2005–2006.  Id.  Verna responded: "I mean it doesn't make that much difference to my health, you know.  It's like I've been through, you know, my life is hell.  I can tell you. It's just like the way I've been suffering."  Id.  The ALJ asked the same question in a different format: whether Verna had felt the same since 2002.  Id.  Verna replied:

Just — you know I've been in the hospital.  I mean, you know, it's like in and out, most likely, it's like the, after the surgery compared to, I mean, you know, it's a a [sic] little bit, you know, afterwards, you know I can tell you it's, difference is not that much difference [sic] in my health.  Just I mean sometime, I mean [INAUDIBLE] God can take me away and, you know, [INAUDIBLE] suffer no more.

R. 1009–10.  Verna said that he could neither stand nor sit in one place for more than five or 10 minutes.  R. 1017.  He further claimed that he could not lift, bend, or climb stairs.  R. 1018.  He walked with a cane to help him balance, which he indicated he used during the January 2005 to February 2007 time period.  R. 1015–16.  He testified that he had to "stay close to the bathroom all the time," given that he had to use the bathroom upwards of seven times a day.  R. 1022.

Christina Boardman, a vocational expert, also testified at the June 21, 2010 hearing.  R. 1023–29.  Boardman classified Verna's past work as a meat delivery driver as medium work.  R. 1025.  She concluded that a hypothetical person with Verna's background and skills, who was capable of "performing a full range of light exertional work," would be unable to work as a meat delivery driver.  Id.  But in Boardman's opinion, such a person would be able find a job in the local economy as a ticket taker, coatroom attendant, or messenger.  R. 1025–26.  Similarly, assuming this hypothetical person could only perform sedentary work, Boardman indicated that the person could still find work, for example, as a billing and posting clerk or a production clerk.  R. 1027.  When asked if this hypothetical person would be able to find a job if he required five to 10 minute bathroom breaks every hour, Boardman concluded that there were no jobs in the economy that suited that hypothetical person.  R. 1028.  Additionally, when asked if this hypothetical person would be able to sustain a job assuming an inability "to consistently . . . complete an eight hour work day or 40 hour week," Boardman stated "[n]ot on a full time basis."  Id.

C.      The ALJ's June 24, 2010 Decision

On June 24, 2010, ALJ Lemoine issued a decision in which he determined that Verna
was not entitled to disability insurance benefits for the period between January 1, 2005 to
February 20, 2007.  R. 664–73.  First, he noted that Verna had already been found to be disabled
from February 2, 2002 to December 31, 2004 and after February 21, 2007, and that the only
period at issue was between January 1, 2005 to February 20, 2007.  R. 667–68.  The ALJ next
determined that Verna had not engaged in substantial gainful activity during the coverage period.
R. 669.  The ALJ found that Verna had the following medically determinable impairments
throughout the relevant period: "Crohn's disease with chronic abdominal pain; HIV infection;
hepatitis B and C infection; and diabetes mellitus."  Id.  Noting weight stabilization and
insufficient evidence concerning endocrine and immune system disorders, the ALJ held that
Verna's condition did not meet the listing impairments found in sections 5.00, 9.00 or 14.00 of
20 C.F.R. Part 404, Subpt. P, App. 1, including specifically sections 5.07 and 5.08.  R. 670.  The
ALJ then concluded that the severity of Verna's medical conditions decreased during the period
at issue.  Id.  While the combination of Verna's medical impairments was severe enough to limit
his ability to perform basic work activities, the ALJ found that he retained the residual functional
capacity to perform "light" work.  R. 670–72.  Specifically, the ALJ assessed that Verna could
lift 20 pounds occasionally and 10 pounds frequently; "[d]uring the course of an 8-hour
workday, [Verna] could stand and/or walk for a total of 6 hour[s], and sit for a total of at least 6
hours."  R. 671.

The ALJ included findings as to Verna's credibility.  Id.  The ALJ found that Verna's
claim that his condition had remained unchanged since 2002 was not corroborated by the
objective medical evidence during the relevant time period.  Id.  The ALJ pointed to Dr.

15

Phillips's opinion that Verna's body weight had risen significantly, that there was no documentation of any significant infections, and that his diabetes was well-controlled except for some elevated glucose levels attributed to steroid therapy.  Id.  The ALJ found that Verna's statements concerning the "intensity, persistence and limiting effects of" his symptoms were not objectively corroborated for the period under consideration.  Id.

The ALJ found that because Verna's former positions required medium exertional activity, Verna was unable to perform his past relevant work.  R. 672.  However, the ALJ concluded that — considering Verna's "age, education, work experience, and residual functional capacity" — there were a significant number of jobs in the national economy that Verna could perform.  R. 672–73.  As a result, the ALJ concluded Verna was not eligible for Social Security disability benefits during the relevant time period.  R. 673.

II.      APPLICABLE LEGAL PRINCIPLES

A.      Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

16

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded [to] the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). The Second Circuit has characterized the substantial evidenced standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). The "substantial evidence" standard means that "once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citation and internal quotation marks omitted).

B.     Standard Governing Evaluation of Disability Claims by the ALJ

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

17

work experience, engage in any other kind of substantial gainful work which exists in the

national economy . . . ."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a multi-step process that

the Commissioner must use in deciding whether an individual already found disabled has

undergone a "medical improvement" that enables the claimant to engage in substantial gainful

activity.  See 42 U.S.C. § 423(f)(1); 20 C.F.R. § 404.1594.  The steps relevant to Verna's case

are as follows.  First, in evaluating the claim, the Commissioner must determine whether the

claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1594(f)(1).

If the claimant is not engaged in substantial gainful activity, the Commissioner must determine if

there has been a "medical improvement," as defined in the regulations, which is shown by a

"decrease in medical severity."  Id. § 404.1594(f)(3).  If so, the Commissioner then determines

whether there has been an increase in the residual functional capacity.  Id. § 404.1594(f)(4).

Where, as here, the Commissioner finds that a claimant's impairments are no longer severe, the

Commissioner then determines whether the current impairments in combination are severe and

what impact the combination of those impairments has on the claimant's ability to function.  Id.

§ 404.1594(f)(6).  If the evidence shows that the claimant's impairments in combination do not

significantly limit his ability to do basic work activities, these impairments will not be

considered severe in nature and the claimant will be found to be no longer disabled.  Id.  But if

18

the impairments are severe, the Commissioner assesses the claimant's ability to do substantial

gainful activity.  Id. § 404.1594(f)(7); see also id. § 404.1560.  That is, the Commissioner will

assess the claimant's residual functional capacity.  Id. § 404.1594(f)(7).  If the claimant is found

able to perform past work, the disability will be found to have ended.  Id.  If the claimant is not

able to do past work, the Commissioner considers whether he can do other work given the

residual functional capacity assessment and the claimant's age, education, and past work

experience.  Id. § 404.1594(f)(8).

III.    DISCUSSION

    Verna's brief is not clearly divided into separate points.  Nonetheless, it appears he

makes the following arguments: (1) the ALJ improperly failed to give controlling weight to the

opinions of Verna's treating physician, Dr. Spiegel, Verna Mem. at 13–16, 18; (2) the ALJ

improperly ignored the medical evidence from Nyack and WCMC, id. at 14–15; and (3) the ALJ

improperly ignored the testimony of the vocational expert, Boardman, id. at 14, 18.  As

explained below, these arguments must be rejected.

    A.    Treating Physician Rule

    Under the "treating physician rule," an ALJ must accord "a measure of deference" to the

medical opinions of a social security claimant's treating physician.  Halloran v. Barnhart, 362

F.3d 28, 31 (2d Cir. 2004).  The ALJ must give "controlling weight" to a treating physician's

medical opinion as to the nature and severity of a claimant's impairments if the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R.

§ 404.1527(c)(2); accord Morales v. Astrue, 2012 WL 414236, at *7 (S.D.N.Y. Feb. 9, 2012)

(citation omitted).  Inversely, the opinions of a treating physician "need not be given controlling

19

weight where they are contradicted by other substantial evidence in the record," Veino v.

Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted), including "the opinions of other

medical experts," Halloran, 362 F.3d at 32, because "[g]enuine conflicts in the medical evidence

are for the Commissioner to resolve," Veino, 312 F.3d at 588 (citing Richardson, 402 U.S. at

399); accord Burgess, 537 F.3d at 128.

If the opinion of a treating physician is rejected, the ALJ must "provide good reasons for

the weight [given] to the treating source's opinion." Halloran, 362 F.3d at 32–33 (citing Schaal

v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted).  When assessing

how much weight to give the treating source's opinion, the ALJ should consider factors set forth

in the Commissioner's regulations, which include: (i) the length of the treatment relationship and

the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the

supportability of the opinion with relevant evidence, particularly medical signs and laboratory

findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion

is from a specialist; and (vi) other relevant evidence.  See 20 C.F.R. § 404.1527(c)(2); see also

Ellington v. Astrue, 641 F. Supp. 2d 322, 330–31 (S.D.N.Y. 2009) (the ALJ "should weigh the

treating physician's opinion along with other evidence according to the factors" listed in 20

C.F.R. § 404.1527(c)(2)–(6)).  Courts "do not hesitate to remand when the Commissioner has

not provided 'good reasons' for the weight given to a treating physician[']s opinion and [should]

continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set

forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at

33.

While Verna and his attorney identified Dr. Spiegel as a treating physician, see R.

1010–12; Verna Mem. at 16 (Dr. Spiegel was Verna's "primary treating physician from 2004 to

20

June, 2009" who "prescribed a variety of pain relievers and medications for [his] symptoms"), no party has identified any medical records of Dr. Spiegel other than the forms Dr. Spiegel filled out in August 2007 and August 2009 regarding Verna's ability to do work.  See R. 660–63; R. 942–47.  Thus, the record does not support application of two of the factors relevant to the treating physician rule: the length of the treatment relationship and the frequency of the examination, and the nature and extent of the treatment relationship.

In rendering a decision, the ALJ considered Dr. Spiegel's opinion that Verna had a less than sedentary residual functional capacity, but found that Dr. Phillips's opinion — that Verna was capable of light to moderate work — was entitled to greater probative weight.  R. 671–72.  Specifically, the ALJ found that Dr. Spiegel's opinion was inconsistent with medical documentation.  R. 671–72.  Verna's medical condition had "unequivocally improved" during the time period in question.  R. 671.  Although Verna had "intermittent flare-ups of Crohn's disease, including . . . a three-day admission to Nyack Hospital in January, 2005," his weight stabilized, and there were "no significant adverse side effects" from his medications "chronicled in the treatment records."  R. 670.  Nor was there "documentation of any significant opportunistic infections related to his HIV infection . . . ."  R. 671.  Moreover, "his diabetes was reported as being well controlled except for some elevated glucose levels attributed to a course of steroid therapy."  Id.

The ALJ further noted that there was nothing to suggest that Dr. Spiegel's opinion even addressed the relevant time period.  R. 672.  All of Dr. Spiegel's assessments were dated after February 20, 2007.  Id.  The ALJ specifically noted that "[t]here is no indication that [Verna] was even treated by Dr. Spiegel prior to" that date.  Id.  When it is not possible "to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do

not contain detailed support for the opinions expressed," the ALJ has a duty to request missing or incomplete information, as well as to recontact the treating physician to clarify his or her opinions. Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)); accord Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). Here, the ALJ made such a request and thus fulfilled that duty. R. 757, 941. In response, however, Dr. Spiegel "merely completed a similar form citing essentially the same functional limitation." R. 671. The ALJ was fully justified in finding that the opinion could not be relied upon to address the relevant period and that it was not otherwise corroborated by medical records. See Conte v. Astrue, 2010 WL 2730661, at *5 (N.D.N.Y.) (finding record developed where ALJ recontacted treating physician for clarification of opinion and the response did "not justify granting the [opinion] any further evidentiary weight") (internal quotation marks omitted), adopted, 2010 WL 2730652 (N.D.N.Y. July 7, 2010). This is particularly so given that there is no record of Dr. Spiegel ever having provided treatment to Verna.

In sum, the ALJ was not required to give Dr. Spiegel's views "controlling weight" inasmuch as his opinion was inconsistent with other substantial evidence in the administrative record, including Dr. Phillips's opinion. See Mongeur, 722 F.2d at 1039 ("[T]he opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (citation omitted). Furthermore, the ALJ gave "good reasons" for disregarding Dr. Spiegel's opinion, including the inconsistency of his opinion with the medical records and the fact that there was no evidence that Dr. Spiegel treated Verna during this time. The ALJ's decision therefore did not violate the "treating physician rule."

    B.    Evidence from Nyack and WCMC

22

Verna argues that the ALJ erred by "disregard[ing]" treating source evidence from Nyack and WCMC.  Verna Mem. at 14 (citing R. 261–490, 493–631) (medical records).  The governing rules require an ALJ to "consider all evidence [the claimant] submit[s], as well as all evidence [the Commissioner] obtains from [the claimant's] treating physician(s) and other medical or nonmedical sources."  20 C.F.R. § 404.1594(b)(6); see also SSR 96–5P, 1996 WL 374183, at *3 (July 2, 1996) ("The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability . . . .").  Here, the ALJ stated that he was considering "the entire record," R. 669, and cited numerous times to the records from Nyack and WCMC, R. 670.  As for the Nyack records, a significant portion pre-date January 1, 2005.  See R. 261–411.  The remaining records concern Verna's hospitalization in January 2005.  See R. 412–91.  In rendering a decision, the ALJ specifically noted Verna's "three-day admission to Nyack Hospital in January, 2005 due to a small bowel obstruction," but still found that his condition had improved during the period at issue.  R. 670.

The ALJ also considered the WCMC records, citing to them, for example, when he noted that Verna's weight stabilized between 170 and 180 pounds during the relevant time period.  Id. (citing R. 496, 501, 504, 525, 537, 551, 553, 555).  The ALJ also clearly considered the WCMC medical records in determining that Verna's diabetes was generally under control.  See R. 671; see also R. 537 (noting that Verna's diabetes was "apparently well controlled" on medication).  Because there is no reason to doubt that the ALJ considered the relevant medical records from Nyack and WCMC, Verna's argument that the ALJ disregarded these records is without merit.

C.    The ALJ's Reliance on Opinion Testimony of a Vocational Expert

Verna argues that the ALJ improperly evaluated the testimony of Boardman, a vocational expert.  See Verna Mem. at 14, 18.  Specifically, Verna contends that the ALJ ignored

23

Boardman's opinion that Verna was "not capable of performing work for 8 hours." Id. at 18.

Boardman, however, gave no such testimony.  The ALJ had asked Boardman for her opinion as

to whether a hypothetical person with certain physical and non-exertional limitations could

obtain gainful employment in the economy and, if so, in what occupations.  See R. 1025–28.

The ALJ first asked Boardman to opine on the employment options for a person "who is of the

same age, education and work history as the claimant" and is "capable of performing a full range

of light exertional work."  R. 1025.  Boardman indicated that there were a number of jobs in the

local economy that such a hypothetical person could perform, including ticket taker, coatroom

attendant, and messenger.  R. 1026.  The ALJ also asked Boardman several other hypothetical

questions, including whether a person "unable to complete an eight hour work day or 40 hour

week, would be able to sustain" a full time job.  R. 1028.  She answered that such a person

would not be able to sustain employment on a "full time basis."  Id.  Thus, Boardman simply did

not testify that Verna himself could not work an eight-hour day.

    Nor did the ALJ improperly accept Boardman's conclusions that there were jobs in the

economy for persons "capable of performing a full range of light exertional work."  R. 1025.  An

ALJ may rely on the opinion of a vocational expert concerning the occupational opportunities of

a hypothetical person with certain limitations as long as the limitations posed in the question are

at least as restrictive as those of the claimant and are supported by substantial evidence.  See

Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); Briscoe v. Astrue, 2012 WL 4356732,

at *15 (S.D.N.Y. Sept. 25, 2012) (citing cases).  The limitation posed in the question that the

ALJ relied upon — that is, a person who was capable of performing only light work — is

consistent with the ALJ's finding regarding Verna's residual functional capacity.  R. 670–72.

Furthermore, substantial evidence in the administrative record supported this finding.  The ALJ

made this determination after "consider[ing] all symptoms and the extent to which these symptoms c[ould] reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." R. 671. The ALJ noted that Verna's condition improved during the relevant time period, as his weight stabilized and he had no documented adverse side effects from his medications, R. 670, and thus rejected his testimony to the contrary, R. 671. The ALJ credited Dr. Phillips's opinion that Verna was capable of performing at least light work. R. 650, 671–72. Although Dr. Spiegel's assessment suggested that Verna was not capable of performing such work, the ALJ provided sufficient "good reasons" for rejecting his opinion.[7]

Because the determination that Verna was capable of performing light work is supported by substantial evidence, the ALJ could rely upon Boardman's assessment that a hypothetical person similarly situated to Verna who was capable of light work would be able to find a job in the economy. See Harris-Batten v. Comm'r of Soc. Sec., 2012 WL 414292, at *5 (S.D.N.Y. Feb. 9, 2012) ("Because the ALJ's determination of Plaintiff's residual functional

---

[7] While Verna's brief does not argue that the ALJ improperly failed to credit Verna's own testimony as to his condition during the relevant time period, we note that the ALJ's decision not to credit Verna's testimony was supported by substantial evidence. As already noted, Verna testified that his symptoms had remained completely unchanged since 2002 and thus that he had the same pain after 2004 that he had prior to 2004. R. 1009–10. But as indicated by Dr. Phillips, Verna's medical impairments were in fact well controlled during this time period. R. 649–50. Additionally, during the relevant time period Verna himself reported on numerous occasions to medical personnel that he had either no pain at all or just intermittent pain. See R. 413, 496, 501, 502, 506, 512, 527, 529, 535–36, 553. Finally, the medical records also showed that there was a dramatic rise in Verna's weight, from 129 pounds, R. 563, to a steady weight of about 178 pounds, see R. 499, 501, 502, 504, 510, 512, 531, 533–35, 540, 895; that there were no "significant opportunistic infections related to his HIV infection," R. 671; and that his diabetes was "well controlled except for some elevated glucose levels attributed to a course of steroid therapy," id. Because the objective medical evidence did not substantiate Verna's statements concerning the intensity and persistence of his condition, the ALJ could properly find that Verna's statements as to his condition were "not objectively corroborated during the period under consideration." Id.

capacity . . . was supported by substantial evidence, it was appropriate for this determination to

be incorporated into the hypothetical questions posed to the vocational expert.") (citation

omitted).  Additionally, the ALJ properly relied on the medical vocational guidelines —

commonly known as the "grids" — to reach the same conclusion.  R. 672–73.  The grids indicate

that individuals of Verna's profile will not be considered disabled.  See 20 C.F.R. Part 404,

Subpt. P, App. 2, § 202.21 (individual with untransferable skills age 18–49 with a high school

education who can perform light work is not considered disabled).

V.      CONCLUSION

          For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 10) should be granted.  Verna's motion for judgment on the pleadings (Docket # 14)

should be denied.


**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

          Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Alison J. Nathan, at 40 Foley Square, New York, New York

10007, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request

for an extension of time to file objections must be directed to Judge Nathan.  If a party fails to

file timely objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP

v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir.

2010).


Dated: February 15, 2013
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge